FILED

SEP 2 2 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BETTY LASTER , et al.    )
                          )
        Plaintiffs,       )
                          )
           v.             )    CASE NUMBER   1:05CV01875
                          )
DISTRICT OF COLUMBIA, et al.  )    JUDGE: Ricardo M. Urbina
                          )
        Defendants        )    DECK TYPE: TRO/Preliminary Injunction
                          )
                          )    DATE STAMP: 09/22/2005
_____   )

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

Plaintiffs move this Court for preliminary injunctive relief, pursuant to Rule 65(b)

of the Federal Rules of Civil Procedure, and the Stay-Put provision of the Individuals

with Disabilities Education Act, 20 USC § 1415 (j), restraining Defendants from

violating the Stay Put provision and requiring Defendants to maintain the Plaintiffs' Stay

Put placements or equivalents thereto.

The grounds for Plaintiffs' Motion are set forth in the accompanying

Memorandum of Points and Authorities.

Respectfully submitted,

Karen D. Alvarez. Esq.
D.C. Bar No. 423186
1442 Foxhall Road, N.W.
Washington, D.C. 20007
(202) 333-8553

**FILED**

SEP 2 2 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Betty Laster, et al,               )
                                   )
                                   )
                                   )
        Plaintiffs,                )        Civil Action No. **05 1875**
                                   )
                                   )
        v.                         )
                                   )
DISTRICT OF COLUMBIA, et al.       )
                                   )
                                   )
        Defendants.                )

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

Plaintiffs have moved this Court for a temporary restraining order,
restraining Defendants from an on-going violation of Plaintiffs' Stay Put rights
under the Individuals with Disabilities Education Act, as amended ("IDEA").
Plaintiffs here request that this Court order DCPS to maintain the minor
Plaintiffs' school year 2004-2005 IEPs  and the minor Plaintiffs' school year
2004-2005 programs and placements, as mandated by the Stay Put provision of
IDEA, 20 U.S.C.§ 1415(j).

**INTRODUCTION**

When DCPS decides to change the classification, IEP or placement of a
student, the Stay Put provision enjoins DCPS from removing the child from the
child's last agreed upon special education placement and program, until the
IDEA due process hearing, and any appeal, is completed. Defendants have

resolutely refused to comply with IDEA's mandatory Stay Put injunction and have taken affirmative steps to deprive Plaintiffs of their Stay Put, and other, rights.

As of July 28, 2005 and August 12, 2005, DCPS had a statutory duty to maintain the 2004-2005, the Stay Put, placements of T.L. and A.J.P., respectively. Plaintiffs have attempted to resolve the Stay Put matter with DCPS, by personal telephone calls and correspondence, and have filed Due Process Complaints with the DCPS Student Hearing Office, asserting their Stay Put rights and requesting assistance in obtaining DCPS agreement to a Stay Put placement for their children.

In the case of A.J.P., Defendants have defied an administrative hearing officer's order requiring DCPS to maintain the child's 2004-2005 school placement as his Stay Put placement. In the case of C.A., Defendants have violated a hearing officer's determination requiring them to fund the placement that is C.A's Stay Put placement.  As a result, T.L. has not been in school since August 29, 2005, C.A. has not been able to attend her day program since August 29, 2005 and A.J.P. has been without the specialized instruction, related services and supplemental aids that he requires.

Unless this Court issues a temporary restraining order requiring DCPS to maintain their Stay Put placements, Plaintiff children will not receive the education, and procedural safeguards, which IDEA assures them.

## I.
## FACTS

**A. Students' School Year 2004-2005 IEPs and Placements**

**T.L.**

2

In school year 2004-2005 T.L. attended KDS, a private special education school that provides full time specialized instruction, related services, and supplemental aids exclusively to children with severe " Specific Learning Disabilities." Ex. At ¶¶ 6-7. See 20 USC 1401(30) (defining "Specific Learning Disability") Comprehensive evaluations performed in Summer 2003, demonstrated that T.L. suffered from a range of severe learning disorders, including disorders of Reading, Writing, auditory processing, memory, visual perception, and executive function. Ex. A at ¶ 3. T.L.'s 2003 evaluations found that because of those disorders, T.L. was reading and writing at the Second Grade level, although he was then a rising Ninth grader. Ex. A at ¶ 4. Those evaluators uniformly recommended that T.L. be placed in a program like that of KDS. Ex. A at ¶5. DCPS classified him as "Specific Learning Disabled," and issued a notice placing him at KDS in December 2003. Ex. G.

At KDS students are instructed in classes of no more than 8 students, by certified special education teachers who have been trained in specialized teaching methods that have been shown to be successful in teaching children with specific learning disorders how to read and write. Ex. H. Text books and instructional materials used at KDS are designed specifically for learning disordered students. Instruction at KDS is integrated with Speech therapy and occupational therapy. Ex. H. In addition pull-out Speech and occupational therapy are available on-site for students, like T.L. who require them. Ex. A at ¶ 6; Ex. H.

In May 2004, KDS performed its annual review of T.L.'s IEP, and developed an IEP for school year 2004-2005. Ex. I. At 1. T.L.'s 2004-2005 IEP

called for continued placement at KDS as a student with "Specific Learning

Disabilities." Id. Taken together, that IEP and placement provided for:

> (a) full time specialized instruction within the KDS program, in
> (b) a private special education school, where
> (c) all staff are certified in special education,
> (d) all staff are trained in research-approved techniques of specialized instruction shown to enable students with specific learning disabilities to learn to read and write and to permit them to master  coursework required for graduation,
> (e) all students are children with Specific Learning Disabilities,
> (f) classroom instruction is integrated with Speech and OT,
> (g) assistive technology designed for learning disabled students is incorporated into the program,
> (h) 2 hours weekly of pull-out of individual Speech Therapy,
> (i) 1 and ½ hours of pull-out occupational therapy,
> (j) 5 hours weekly of one-on-one tutoring by tutors trained in working with specific learning disordered children,
> (k) two sessions weekly on individual psycho-therapy.

Ex. A at ¶ 6; Ex. H; Ex. I at 1. That IEP and program were in force throughout

school year 2004-2005.

**A.J.P.**

In school year 2004-2005  A.J.P. attended an inclusion, pre-school

classroom  in a language-intensive program at Stoddert ES. A.J.P. was in a

regular education classroom of 15 children, 10 of whom were non-disabled, 5 of

whom were children with various disabilities. Ex. B at ¶ 5.  His classroom was

staffed by two teachers ( one general education teacher and one special

education teacher), a general classroom aide and A.J.P.'s personal dedicated

aide. Id.. A.J.P. began receiving IDEA services, under Part C of IDEA,  in 2003,

after having been determined to be "Developmentally Delayed." Ex. B at ¶ 3; Ex.

J; Ex.K.  See 20 also  U.S.C.§ 1401(3)(defining "Developmental Delay).  A.J.P,

received those services at his day care center, until Summer 2004. Ex. B at ¶ 2.

A.J.P. attended the Stoddert inclusion program pursuant to a Transition

Plan executed in April 2004, an IEP developed on August 12, 2004, and a notice

4

of placement issued that same date, all of which classified him as

"Developmentally Delayed." Ex. K at 1,12.Those documents required that A.J.P.

receive:

> a) Specialized instruction,
> b) Speech therapy,
> c) Occupational therapy,
> d) Sign language instruction,
> e) Assistive technology services,
> f) a dedicated aide,
> g) a language-based curriculum.

Ex. B at ¶ 3 : Ex. J. at 2  ( 2004 Transition Plan) ; Ex. K  at 12 (Aug.12,2004

IEP). A. J. P.'s  August 12,  2004 IEP Team determined that AJP requires a

dedicated aide, because A.J.P. is not yet verbal, to assist him in the classroom.

That 2004 IEP and Transition Plan program were in force throughout school

year 2004-2005.

**C.A.**

In School Year 2004-2005 C.A. attended a joint day and residential

program, pursuant to an IEP that has remained essentially unchanged since

Spring 2003. Ex. E at ¶¶ 2-4 (Declaration of Chanda Alston ); Ex. F at ¶¶ 2-12.

(Declaration of Melisa Phillips); See also Ex. D at  (2003 Hearing Officer's

Determination ). Her 2003-2004, 2004-2005 and 2005-2006 IEPs and

placements have comprised a residential placement at Grafton School, in

Rockville, MD., combined with a day-instructional program for special

education students at the Cabin John MS. Ex. E at ¶¶ 2-4; see also Ex. D at 5-

7. The combined Grafton/Cabin John IEP and placement were upheld by an

impartial hearing officer in an order of August 22, 2003, in which the Hearing

Officer ordered DCPS to fund both placements and submit authorizations that

the Montgomery County Public Schools required to register C.A. at Cabin John.

Ex. D at 7.

DCPS failed to submit those authorizations in school year 2003-2004. Ex. E at ¶ 5; Ex. F at¶ ¶ 6-12, It did submit them, eventually, in Winter/Spring 2005. Ex. F at ¶ 11.C.A. attended the Cabin John program during day-school hours in Spring Semester 2005. Ex. F at ¶¶ 11-12. On June 20, 2005, DCPS and Mrs. Alston approved the most recent of C.A's Grafton/Cabin John IEPs, to be implemented during the 2005-2006 school year. Ex. L.

### B. Summer 2005 DCPS Decision to Change Evaluation, IEP, or Placement

In July and August 2005, DCPS took or failed to take actions in respect of the educational programs that substantially changed the classifications, IEPs or educational programs/placements of the Plaintiff children. These changes fundamentally alter the educational profile and programming requirements and staff qualifications of the classrooms in which Plaintiffs are educated. For T.L. and A.J.P., the 2005-2006 IEPs and placements greatly alter the expectations for the child's progress in areas that the 2004-2005 IEPs and placements---and all prior educational assessments or evaluations --- had identified as central to the child's educational needs. For C.A., DCPS' failure to implement the August 2005 IEP eliminates much of the specialized instruction required by her IEP.

**T. L**

On July 28, 2005, DCPS issued a "Multidisciplinary Team Prior Notice." That Notice advised Mrs. Laster that:

> " State and federal laws regarding students with disabilities require school systems to notify and inform parents of certain changes being made to their children's education program. [Y]ou are being notified of the following proposed changes: Proposes[sic] to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.... Your child's

category of learning disability is being changed from Learning
Disabled to Learning Disabled/Emotionally Disturbed; Your
child's alternative placement on continuum (next setting) is being
changed from Kingsbury to DCALA-NE."

Exhibit M.

Effect of Re-classification and Placement Change. DCALA, N.E., is a public-
private partnership school for students who have severe behavioral and
emotional disorders : it does not program for children with Specific Learning
Disabilities. Ex. N at 1,7,9,10; Ex. A at ¶ 9. Unlike T.L.'s 2004-2005 KDS
placement, the DCALA program focuses on behavioral modification through the
application of point-system behavioral contracts that restrict a students' rights
and privileges until the child is able to earn a certain level of points. Ex. N at 3-
4. None of the evaluations performed in 2003 concluded that T.L. was
emotionally disturbed. Ex. A at ¶ 5.

DCALA does not focus on teaching learning disabled children to read
and write; DCALA staff are not uniformly certified special educators, and are
not trained in approved techniques to teach children with specific learning
disabilities to read and write. Ex. N; Ex. O (DCALA advertisements for general
education teachers, certified and not yet certified) .The DCALA program, in
contrast to the KDS program, does not integrate Speech and Occupational
therapy into the classroom setting. Ex. N. As a consequence, T.L---with
auditory processing disorders, executive function disorders and visual-
perceptual disorders--- would not be able to function in a DCALA classroom.
Ex. A at ¶ 9; Ex. I at 2-3,23 29; Ex. P at 2 (July 28, 2005 IEP).

Other IEP Changes. The 2005-2006 school year IEP substantially
reduced or eliminated the related services and supplemental aids that the
2004-2005 IEP had found necessary. These related services directly address the

7

learning disorders that have prevented T.L. from learning to read and write, and

the lack of executive function and organizational skills that have made it

impossible for T.L. to learn in a regular classroom. The 2005-2006 IEP would

eliminate entirely the five hours of weekly one-on-one tutoring that T.L. received

in 2004-2005, reduce both the number of hours of Speech and Occupational

therapy hours, and permit that time to be provided  solely in group settings.

Compare Ex. I at 1 (May 2004 IEP), with Ex. P at 1 (July 2005 IEP). T.L.,

because of his disabilities, requires individualized instruction, as his  2004-

2005 IEP acknowledged, by requiring that  all of his pull-out  Speech therapy be

individual, that 2/3 of his pull out  occupational therapy be individual, and

that he have five hours weekly of one on one tutoring. Ex. I at 1.

**A.J.P.**

On August 10, 2005, DCPS developed a document purporting to be an

IEP, re-classified AJP, changing his classification from "Developmentally

Delayed," to "Autistic," and issued a notice placing him in the citywide Autism

program at Barnard ES. Exhibit Q. See V D.C. Mun. Regs Ch. 3002, as

amended(differentiating "Developmental Delay" from "Autism"). No evaluation

has determined A. J. P. to be "autistic." Ex. B at ¶ 8.

The DCPS notice, a "Multidisciplinary Team Prior Notice," advised Mrs.

Jackson that:

> " State and federal laws regarding students with disabilities require
> school systems to notify and inform parents of certain changes being
> made to their children's education program. [Y]ou are being notified of
> the following proposed changes: Proposes[sic] to initiate or change the
> identification, evaluation, educational placement or provision of FAPE to
> your child.... Your child's category of learning disability is being changed
> from Developmental Delay to Autism; Your child's alternative placement
> on continuum (next setting) is being changed from Stoddert Inclusion
> Program to Barnard Autism Program.....MDT proposed and rejected
> general education and combination general education due to A[J.P.'s]

needs as stated on the IEP."

Exhibit Q (emphasis added).

Effect of Re-Classification and Placement Change. The 2005-2006 placement removes AJP entirely from the general education program. Ex. Q. The Barnard Autism program is a highly restrictive program : not only does it consist exclusively of autistic children, but of children who are severely autistic. Ex. B at ¶ 8. The Barnard placement would isolate A.J.P. from all non-disabled peers, and would isolate him from disabled students with other categories of disabilities. Removal of A.J.P. from the Stoddert inclusion program deprives him of the language-based program that he requires to overcome his severe Speech delays. Ex. B at ¶ 5.

**C.A.**

On June 20, 2005, DCPS and Mrs. Alston approved the most recent of C.A.'s Grafton/Cabin John IEPs. Grafton staff have been unsuccessful in their attempts to extract the required authorizations from DCPS, with the result that C.A. has not been able to attend her day special education program at Cabin John since the school year started on August 29, 2005. Ex. E at ¶ 6; Ex. F at ¶¶ 14-15,22. Failure to submit payment authorizations constitutes a change of C.A.'s placement. Petties v. D.C., 881 F.Supp. 63 (D.D.C. 1995)(DCPS failure to make payment in whole or in part to school constitutes a unilateral change in child's placement).

**C. Notice to DCPS and Assertion of Stay Put Rights July—September 2005**

**T.L.**

Mrs. Laster disagreed with the July 2005 IEP and placement for T.L. and asserted her Stay Put right to maintain T.L. at KDS at the IEP meeting there on July 28, 2005. Ex. A at ¶ 10. She reasserted her Stay Put rights in correspondence with DCPS of August 26, 2005 and September 1,2005. Ex. R, S. DCPS made no response to letters requesting that DCPS maintain T.L. at KDS or propose an equivalent Stay Put placement. Ex. A at ¶¶ 13-17.Instead, DCPS sent DCPS special education buses to transport T.L. to DCALA. Id. at ¶ 18. Mrs. Laster filed a Due Process Complaint on September 9, 2005, in which she again asserted her Stay Put right. Ex. T at 4.

**A.J.P.**

Mrs. Jackson informed DCPS that she disagreed with the IEP developed on August 10, 2005 and with the placement notice issued on that date at the IEP meeting of August 10, 2005. Ex. B at ¶ 9. Mrs. Jackson asserted her Stay Put right to maintain A.J.P. at his Stoddert ES program on August 26, 2005. Id. at ¶ 9; Ex. U. On August 29, 2005, the first day of school, A.J.P. was denied admittance to Stoddert. Ex. B at ¶ 10. Mrs. Jackson re- asserted her Stay Put right, requesting a Stay Put placement at Stoddert ES, or its equivalent, on August 29, 2005 and September 1, 2005. Ex. U, V. Mrs. Jackson filed a Due Process Complaint on September 8, 2005 in which she again asserted A.J.P.'s right to Stay Put at Stoddert or an equivalent program and requested assistance in obtaining an equivalent Stay Put Placement. Ex. W.

**C.A.**

Grafton staff advised DCPS of the need to submit authorizations for C.A.'s special education day program at Cabin John MS throughout August and September 2005. Ex. F at ¶---Mrs. Alston filed a Due Process Complaint on



September 13, 2005. Ex. X. In her Due Process Complaint Mrs. Alston asserted

C.A.'s right to Stay Put at her Cabin John/Grafton placement and requested

that an order issue requiring DCPS to submit the required authorizations

forthwith so that C.A. might attend her Cabin John day program. Id. at 4.

## II
## LAW

### A. Stay Put Preserves Last Valid IEP and Placement

The Stay Put provision, 20 USC Section 1415(j) is an automatic

or statutory injunction. Zvi D. v. Ambach, 694 F.2d 904, 906 (2d Cir. 1982),

citing Honig v. Doe, 484 U.S.305 (1988). The Stay Put provision prevents

school authorities from effecting unilateral changes to a child's school

placement and educational program. Honig v. Doe, 484 U.S. 305 (1988). The

Stay Put provision states:

> "[D]uring the pendency of any proceedings conducted pursuant to
> this section, unless the State or local educational agency and the
> parents otherwise agree, the child shall remain in the then-
> current educational placement of such child...."

20 U.S.C.§1415(j). The Stay Put Provision protects Plaintiffs by maintaining in

force the child's last valid Individualized Educational Program ("IEP")[1] and

placement, while the parent exercises her IDEA right to challenge decisions and

actions of the school district. Burlington v. Dep't of Education, 471 U.S. 359,

---

[1] The Supreme Court has described the IEP as the cornerstone of IDEA. Burlington v. Board of Education, 471 U.S. 359, 367-368 (1985). IDEA defines an IEP as a written statement of the child's educational needs that is developed in accordance with 20 U.S.C.§ 1414(d). 20 U.S.C.§ 1401. It must be based on the results of comprehensive educational assessments that determine the areas of the child's educational needs and must be developed by a Team that includes the child's parent and educators familiar with the student. 20 U.S.C. § 1414(d)(1)(B). The development of the IEP is surrounded by procedural safeguards, intended to protect and enhance parental participation in the development of the IEP. 471 U.S. at 367-368; See, e.g. 20 U.S.C. § 1415; 34 C.F.R.§§ 300.344-300.345, 300.500 – 300.505. Once an IEP has been developed in accordance with Section 1414, IDEA requires that a group that includes the child's



361(1985). Courts sometimes formulate the <u>Burlington</u> test as maintaining the last IEP and Placement that was agreed upon by both the parent and the school district.[2]

## B. Stay Put Accrues upon DCPS' Decision to Change Evaluation, Program or Placement

Stay Put protection applies from the time that the school district decides to change the child's evaluation, program or placement until the parent decides not to contest that decision, or, if the parent does decide to litigate, until the administrative hearing is completed and any appeal is decided.  20 U.S.C. §1415(j); <u>Stemple v. Bd of Ed</u>, 623 F2d 893(4th Cir. 1980), <u>cert. den'd</u> 450 U.S. 911(1981)(Stay Put protections apply as soon as school authorities decide to change identification, evaluation or placement of child); <u>Termine v. Hart</u>, 219 F.Supp.2d 1049 (C.D.Cal. 2002) (Stay-put provision applies to all proceedings under Section 1415), <u>citing</u> <u>K.T. v. West Orange</u>, 2001 U.S.Dist. Lexis 22265 (D. N.J. Oct.23,2001).

## C. Stay Put Protection Can Not Be Waived

The parent can not lose her Stay-put protection except by affirmative agreement. <u>Drinker v. Colonial School Dist.</u>, 78 F.3d. 859, 868 (3d Cir. 1995)(court unable to find any case suggesting that parent can waive stay-put right except by affirmative agreement to give it up).

---

parent decide upon the child's placement. 34 C.F.R. §300.552(a)(1). Placement must be based on the child's IEP. 34 CFR.§ 300.552(b)(2)

[2] See also, <u>Drinker v. Colonial School Dist</u>, 78 F.3d 859,867 (3d Cir.1996); <u>Zvi D. v. Ambach</u>, 694 F.2d. 904,908 (2d Cir. 1982)(then current placement is last agreed-upon placement between agency and parent); <u>Spillsbury v. D.C.</u> 307 F.Supp 2d 22 (DDC 2004)( Stay Put implements last valid placement and requires provision of all services decided upon in last valid IEP);  <u>Cosgrove v. Board of Education</u>, 175 F. Supp. 375,384 ( N.D.N.Y. 2001) (then current placement is placement to which agency and parents consented before the parents requested a due process hearing); <u>Beth B. v. van Clay</u>, 126 F.Supp. 2d 532 , 533-34 (E.D. Ill. 2000) (then current placement enforces last agreed upon IEP).

**D. Stay Put Relief Is Granted Without Reference to Traditional Injunctive Relief Standard**

The Stay Put provision of IDEA is an automatic or mandatory injunction. Zvi D. v. Ambach, 694 F.2d 904, 906 (2d Cir. 1982), citing Honig v. Doe, 484 U.S.305 (1988). It is granted without application of the traditional injunctive standard requiring a demonstration of irreparable harm. Andersen v. D.C. , 877 F2d 1018, 1023(DC Cir. 1989); Community High School v. Board of Education, 103 F.3d 545 (7th Cir. 1996)(rejecting defendants demand for evidentiary hearing and balancing of equities). The Stay put provision substitutes an absolute rule for the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fairground for litigation and a balance of hardships. Zvi, supra, 694 F.2d at 906.

It does not require the formal protective hurdles imposed by Rule 65 of the Federal Rules of Civil Procedure. T.H. v. Board of Education, 1998 U.S. Dist. Lexis 19110 at *20-23 (N.D. Ill Dec.2,1998), citing Honig v. Doe, supra, 484 U.S. at 326-327. Once the court ascertains the student's stay-put placement, the movants are entitled to an order without satisfaction of the usual prerequisites to injunctive relief[3]. Drinker v. Colonial School Dist., 78 F.3d. 859, 864 (3d Cir. 1995)

---

[3] It is apparent on the facts of this case and on the legal obligations that IDEA imposes on DCPS that the Laster Plaintiffs would, in any event, meet the traditional requirements for injunctive relief, because this Court and others routinely hold that a child who has been deprived of substantive special educational rights suffers daily irreparable harm, See, e.g. Cox v. Brown , 498 F.Supp. 823, 829 ( D.D.C. 1980 ) ( Children suffer irreparable injury each day that they lack appropriate education). In this Circuit, the traditional standard for immediate injunctive relief requires that a plaintiff establish: (1) a substantial likelihood that she will succeed on the merits of her case; (2) that irreparable harm will occur to plaintiff absent such an injunction; (3) that an injunction would not substantially harm the rights of the defendants; and (4) that an injunction would be in the public interest, or at least not be adverse to the public interest. Sea Containers

**E. No Exhaustion Requirement Prior to Seeking Stay-Put Injunction**

Parents are not required to exhaust IDEA's administrative remedies, when it would be futile or inadequate. Honig v. Doe, 484 U.S. 305, 326-27 ( 1988) (approving  issuance of injunctive relief to parents who had not exhausted administrative remedies before applying for order requiring school district to re-admit child to special education placement) citing Smith v. Robinson, 468 U.S. 992, 1014, n. 17 (1984), 121 Cong. Rec. 37416 (1975) (remarks of Sen. Williams) ("[E]xhaustion . . . should not be required . . . in cases where such exhaustion would be futile either as a legal or practical matter"); Cox v. Jenkins, 878 F.2d 414( D.C. Cir. 1989); North v. D.C. Board of Education, 471 F.Supp. 136,141 at n.8 (D.D.C. 1979).

In this action, Plaintiffs seek to enforce a mandatory statutory injunction, while their parents pursue their IDEA due process right to an administrative hearing, or to appeal. As the facts here show, although DCPS' obligation to maintain those placements attached not later than August 2005, Plaintiffs, to date have been deprived of that right, their filing of Due Process Complaints in which Plaintiffs asserted their Stay Put rights, notwithstanding.

These facts demonstrate the inadequacy and  futility of recourse to the administrative process where the right at issue is  the right to maintain the child's Stay Put placement, from the date on which Defendants decided to change the Plaintiffs' evaluation, identification, IEP or placement,  through the

---

Ltd. V. Stena AB, 890 F.2d 1205 (D.C. Cir. 1989); Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc. , 559 F.2d 841, 842-44 (D.C. Cir. 1977). The four factors of the Holiday Tours test must be viewed as a continuum: more of one factor compensates for less of another. An injunction may be justified where there is a particularly strong showing of likelihood of success on the merits, even if there is a relatively slight showing of irreparable injury, provided that plaintiff demonstrate at least some injury. CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738,747 (D.C. Cir. 1995 ). An injunction may be issued with either a high probability of success and some injury or vice versa. Cuomo v. United States Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C.Cir. 1985).



Due Process Hearing or appeal. In the absence of emergency judicial relief,

Plaintiffs' Stay Put rights will have been extinguished before Plaintiffs have been

able to exercise them : DCPS have evaded its statutory due process obligations;

Plaintiffs will have been forced to decide between no schooling for her child or

inappropriate schooling for her child.

Because immediate injunctive relief is necessary to protect the right

claimed, courts do not require parents seeking to invoke the Stay-put

provisions of IDEA to exhaust their administrative remedies. As the Second

Circuit explained:

> "The United States, appearing as <u>amicus curiae</u>, suggests that the
> exhaustion requirement does not extend to Section 1415(j).... We
> need not decide the issue whether the exhaustion requirement is
> generally applicable to all claims arising under IDEA, because,
> assuming <u>arguendo</u> that it is, <u>an action alleging violation of the</u>
> <u>stay-put provision falls within one, if not more, of the enumerated</u>
> <u>exceptions to this jurisdictional prerequisite....The administrative</u>
> <u>process is 'inadequate' to remedy violations of §1415(j) because,</u>
> <u>given the time sensitive nature of the IDEA's stay-put provision,</u>
> <u>an 'immediate appeal is necessary to give realistic protection to</u>
> <u>the claimed right.'"</u>

<u>Murphy v. Arlington Central School Dist.</u>, 297 F.3d 195,199 (2d Cir.

2002)(citations omitted)(emphasis added).

### III

### PLAINTIFFS' LAST VALID IEP AND PLACEMENT

Applying the <u>Burlington</u> test to the facts here, the Stay Put placements of

the Plaintiff children are, in the cases of T.L. and A.J.P. , respectively, KDS and

the pre-school inclusion program provided at Stoddert ES. For each of T.L. and

AJP, the placements made pursuant to IEPs developed on May 28, 2004 and

August 12, 2004 constitute their last valid IEP and placement, as well as the

15

last IEP and placement that their parents and DCPS agreed upon. In the case of C.A , the <u>Burlington</u> confirms that her last IEP and Placement was the IEP of June 20, 2005, which, like her prior IEPs , provided for a combined placement at Grafton/Cabin John.

DCPS has failed to maintain those placements and IEPs, in violation of IDEA. Plaintiffs are entitled to  emergency injunctive Stay Put relief, ordering DCPS to maintain those placements.

**C.A.**

Maintenance of C.A.'s Stay Put placement requires that DCPS submit the required payment authorization to the Montgomery County Public Schools. Plaintiffs accordingly request that this Court order DCPS to complete and submit the required payment authorization, within 48 hours hereof.

**A.J.P.**

DCPS has informed Mrs. Jackson that the inclusion pre-school program that A.J.P. has attended no longer exists. Ex. V. Where a child's specific placement no longer is available, the school district must provide an alternative placement that is equivalent to the placement/program that no longer exists, and can implement the Stay Put IEP. 20 U.S.C. § 1414 (d)(placement must be based upon IEP); <u>McKenzie v. Smith</u>, 771 F.2d 1527, 1532 (D.C.Cir. 1985)( where KDS student no longer able to attend KDS, DCPS must place student in a program similar to KDS, such as Chelsea School). Here, that would mean a placement in a pre-school general education classroom with his non-disabled peers, with specialized instruction, sign language instruction,  a dedicated aide, Speech therapy and occupational therapy,  all as required in A.J.P.'s  2004 Transition Plan and IEP. Mrs. Jackson repeatedly has requested that DCPS

identify such a program and place AJP there, as his Stay Put placement.  DCPS has refused to do so. Ex. V.

**T.L.**

On August 29, 2005 KDS informed Mrs. Laster and DCPS that it would not agree to serve as T.L.'s Stay Put placement. Ex. A at ¶ 14. Mrs. Laster requested that DCPS prevail upon KDS to permit T.L. to Stay Put at KDS, or that DCPS propose an equivalent Stay Put placement. Ex. S. That would require a placement in a private special education program for students with Specific Learning Disabilities that is capable, inter alia, of providing the resources and programming that were available to T.L. at KDS and are stated in his 2004-2005 IEP. These include : teaching staff who are certified in the special education of severely learning disabled students, are trained in utilizing research-approved methods for teaching severely learning disabled students to read and write, have available the assistive technology such students require, and have classroom in which instruction is integrated with Speech therapy and Occupational therapy. DCPS has refused to propose an equivalent placement.

IDEA directs a court to grant such relief as the court determines is appropriate. 20 U.S.C.§ 1415 (I)(2)(C)(iii). That confers broad discretion on the Court. Burlington, supra. Courts interpreting IDEA recognize that when faced with a school district's refusal to comply with IDEA, parents can and must make alternative arrangements for their child's education. See, e.g., . Holland v. Smith, 71 F.3d 417 ,420 at n. 3 (D.C.Cir, 1995), citing Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 (1993) (citing School Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359 (1985)). McKenzie v. Smith, 771 F.2d 1527, 1531  (D.C.Cir. 1985)(parent forced to make unilateral placement of child in private residential special

17



education facility because of DCPS' failure to comply with procedural and substantive requirements of IDEA is entitled to reimbursement for tuition expenses).

The parent's right to locate an appropriate alternative placement accrues at the moment that the parent informs the school district of the parent's disagreement with the school district's proposed placement. <u>Anna Doe v. Berkeley Unified School Dist</u>, 1993 US Dist. Lexis 4641 at * 25-26(N.D.C.A. April 1, 1993)(parent's entitlement to reimbursement for unilateral placement of child in private school accrues when parent expresses dissatisfaction with school district's placement and requests a change in child's placement), <u>citing</u> <u>Evan v. Dist. No. 17</u>, 841 F.2d 824,829 (8th Cir.1988).

**Parental Equivalent Placements**

In accordance with the Supreme Court's decisions in <u>Burlington</u> and <u>Florence County</u>, Mrs. Laster and Mrs. Jackson have identified placements equivalent to their sons Stay Put placements. They now request that this Court order DCPS to implement the parental Stay Put placement.

Mrs. Laster has located a placement for T.L. at High Road Academy, a non-public special education school for students with severe specific learning disabilities located in Fulton MD. It provides specialized instruction that is essentially the same as that provided to T.L. by KDS, and can implement T.L.'s 2004-2005 IEP. Ex. A at ¶¶ 22-24.; Ex. BB. High Road Academy has accepted T.L. and will admit him immediately upon receipt of a funding order. Ex. Y.

Mrs. Jackson located a pre-school for A.J.P., which he has attended since September 12. 2005. Ex. B at ¶22. Mrs. Jackson has identified service providers who are available to provide the related services and supplemental

18

aids required by A.J.P.'s 2004 Transition Plan and IEP. Id. at ¶ 23-24. She asks
that the Court order DCPS to fund those services at A.J.P.'s pre-school.

A.J.P.'s 2004-2005 IEP required also that A.J.P. have a full-time
dedicated aide. At the August 12, 2005 MDT Meeting, DCPS agreed with Mrs.
Jackson that A.J.P. should have ABA instruction. Ex. Z at 1. DCPS policy
manuals require that DCPS implement those portions of a child's IEP that both
DCPS and the parent agree upon, where the parent can not agree to the IEP in
its entirety. D.C.P.S. Special Education Procedures Manual at VI-6
(http://www. K12.dc.us/dcps/special ed_documents/CHAPTER_VI.pdf,
accessed July 4, 2004 and Sept. 19, 2005). Accordingly, Mrs. Jackson requests
that the Court order DCPS to fund official ABA training for the aides that she
has identified.

Plaintiffs' requests are embodied in their proposed order, a copy of which
is attached hereto.

Wherefore, Plaintiffs respectfully request that a temporary restraining
order issue.

Respectfully submitted,

Karen D. Alvarez
D.C.Bar No. 423186
1442 Foxhall Rd, N.W.

Washington, D.C. 20007
(202) 333-8553

19