wtk

1

GOVERNMENT OF THE DISTRICT OF COLUMBIA

DEPARTMENT OF PUBLIC SCHOOLS

OFFICE OF STUDENT HEARINGS

- - - - - - - - - - - - x
                        :
In the Matter of:       :
                        :
CHANETTE ALSTON         :
                        :
- - - - - - - - - - - - x

Washington, D.C.

Monday, November 14, 2005

The above-entitled matter came on for hearing, pursuant to notice.

BEFORE:

FRED WOODS, Hearing Officer

APPEARANCES:

On Behalf of the Student/Parent:

KAREN ALVAREZ, ESQ.

On Behalf of D.C. Public Schools:

CATHERINE RODI, ESQ.

[TRANSCRIPT PREPARED FROM A TAPE RECORDING.]

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

wtk

2

1                      P R O C E E D I N G S

2          HEARING OFFICER WOODS:  It's Monday,

3    November 14, 2005.  It's approximately 1:20 p.m.

4    and I am Fred Woods, independent Hearing Officer,

5    convening the due-process hearing for Chanette--how

6    do you pronounce her name Cha-netty [ph]?

7          MS. ALVAREZ:  Chanette Alston.

8          HEARING OFFICER WOODS:  Chanette Alston,

9    whose birthday I have as September 19, 1992.

10         This hearing is being convened in

11   accordance with the Individuals With Disabilities

12   Education Act, and the Federal and District of

13   Columbia Laws and Regulations that implement the

14   Act.

15         The purpose for this hearing is to

16   determine whether the District of Columbia Public

17   Schools, complied with those rules.  In light of

18   the fact that the Parent is not here, I'm going to

19   suspend with further introduction of the hearing to

20   allow the parties present to introduce themselves

21   and then visit with the lawyers for just a moment

22   to see where we are with regard to the issues in

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

wtk

3

1  this case?  Ms. Alvarez?

2          MS. ALVAREZ:  Karen Alvarez, on behalf of

3  Ms. Alston and her daughter, Chanette Alston.

4          MS. RODI:  Catherine Rodi, Attorney

5  Advisor, DCPS.

6          MS. COUNSEL:  Residential coordinator for

7  D.C. Public Schools, I'm Diedra Counsel [ph].

8          HEARING OFFICER WOODS:  Ms. Counsel,

9  welcome to all of you.  Ms. Alvarez, will Ms.

10  Alston be joining us today or she's--we're going to

11  proceed without her?

12          MS. ALVAREZ:  She left a message for me

13  this morning stating that her youngest child--she

14  had to take her to the emergency room, she would

15  try to be here if she could get her mother to baby

16  sit after that.  I'm not sure.  She may turn up,

17  but she said that [unintell.] deal with the issues,

18  which are, at this point compensatory education.

19          Ms. Alston filed a due-process hearing--

20          HEARING OFFICER WOODS:  Let me just stop

21  with that right now.  I just wanted to make sure

22  that I could proceed with the mother's authority.

wtk                                                                                                        4

1  So, the mother is saying that we can go forward.

2          MS. ALVAREZ:  Yes.

3          HEARING OFFICER WOODS:  Has she been

4  advised of her due process rights?

5          MS. ALVAREZ:  Yes, she has.

6          HEARING OFFICER WOODS:  And would you

7  waive formal reading of those rights?

8          MS. ALVAREZ:  Yes, I do.

9          HEARING OFFICER WOODS:  Then, let me

10  admit, if there are no objections the parties

11  disclosures.  I received from Ms. Alvarez, a

12  disclosure letter dated November 7, 2005, that

13  lists six witnesses and attached six exhibits.  Ms.

14  Rodi, have you received that disclosure?

15          MS. RODI:  I have and I have an objection.

16          HEARING OFFICER WOODS:  Pardon me?

17          MS. RODI:  I do have an objection.

18          HEARING OFFICER WOODS:  I see, go ahead.

19          MS. RODI;  It was not received until

20  November 7.

21          HEARING OFFICER WOODS:  Okay.  Let's--

22          MS. RODI:  Past the five-day.

wtk

5

1        HEARING OFFICER WOODS:   --okay, what was

2   the due date, then, I'm not--

3        MS. RODI:   November 5.

4        HEARING OFFICER WOODS:   Okay.

5        MS. ALVAREZ:   Because of the holiday.

6        HEARING OFFICER WOODS:   Okay.   What was

7   the holiday?

8        MS. ALVAREZ:   Veteran's day--

9        HEARING OFFICER WOODS:   Oh, but you didn't

10  get it till the day after that, is that what you're

11  saying?

12       MS. RODI:   No, it should have been sent

13  out on the fifth and it was not sent out until

14  November 7.

15       MS. ALVAREZ:   Because of the Veterans' Day

16  holiday, despite the fact there was a full week

17  last week, because of the holiday [unintell.] in

18  that week, in last week, so in order to make five

19  business days, I should have disclosed on Friday

20  the fifth.   And, instead, I disclosed before

21  opening of business on Monday.   There were no

22  evaluations in the disclosure package, so under the

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

wtk

1    federal rules there was no violation of disclosure.

2           HEARING OFFICER WOODS:  Let me make sure

3    I'm clear on this:  The five days, are you saying

4    that--you're not talking about the 11th, then, your

5    objection is on another grounds, is that right?

6           MS. RODI:  No, that we--DCPS has an

7    obligation to get our disclosures in within five

8    days.  Opposing counsel has five business days.

9    The disclosure should have been in on the fifth of

10   November, it did not arrive until the seventh of

11   November.

12          MS. ALVAREZ:  Yes, it should have been in

13   on Friday the fifth.  Because of the holiday on

14   Friday, the eleventh.

15          HEARING OFFICER WOODS:  But the holiday is

16   after that--

17          MS. RODI:  Right but it doesn't--so, what

18   happens is that because it's a Monday, it skips a

19   day because it has to be five business days, so it

20   has to be, it was due on the fifth.

21          HEARING OFFICER WOODS:  And you're saying

22   you agree?

wtk

7

1    MS. ALVAREZ:  I'm saying that it should

2  have been in on the fifth, under the rules.

3    HEARING OFFICER WOODS:  Okay.

4    MS. ALVAREZ:  And Ms. Alston is prepared

5  to continue it if DCPS wishes a continuance.  But

6  Ms. Alston also notes, for the record, that under

7  the federal rules, the five-day disclosure applies

8  only to evaluations and recommendations based on

9  evaluations and there are no evaluations at issue

10  here.

11    HEARING OFFICER WOODS:  Okay.

12    MS. RODI:  And we don't use federal laws

13  here, we use the disclosures under IDEA.  And--

14    MS. ALVAREZ:  That is the federal law.

15    MS. RODI: It's parallel to, but not the

16  same and--

17    MS. ALVAREZ:  Excuse me, what is the

18  palliative?

19    MS. RODI:  It is palliative that federal

20  law is not--

21    MS. ALVAREZ:  Which rules or laws are you

22  referring to?

wtk

8

1          MS. RODI:  Are you talking about Federal

2   Rules of Evidence or IDEA?

3          MS. ALVAREZ:  I'm talking about IDEA.

4          MS. RODI:  Oh, I'm sorry, I thought you

5   were referring to federal rules.

6          MS. ALVAREZ:  No.

7          MS. RODI:  Well no, there's been no

8   exception made for five days whether it's

9   evaluations or a witness list.  And the fact is

10  that hearing officers have continually held up the

11  five-day disclosure rule based on all documents and

12  not just evaluations.

13         MS. ALVAREZ:  I would ask that Ms. Rodi

14  point us to the provision of the statute that she

15  is relying on.  I'm not aware of--

16         MS. RODI:  This is a regular five-day

17  disclosure, why are we getting--why is it so

18  complicated?

19         MS. ALVAREZ:  Well--

20         MS. RODI:  We have a five-day--

21         HEARING OFFICER WOODS:  Why don't we

22  just--again, that's a request that, you know, cite,

1  it just clears it up, for the record that the basis

2  for the objection is based on this particular

3  provision of the rules.  You need the law, you

4  don't have it with you?d

5          MS. RODI:  I don't.

6          HEARING OFFICER WOODS:  Let me grab the

7  rule book.

8          MS. RODI:  I've been making that objection

9  for a year now and--years now, and I can't believe

10  and never once has--when an objection is made by

11  opposing counsel has opposing counsel had to--

12          HEARING OFFICER WOODS:  She asked you for

13  the rule.

14          MS. RODI:  I recognize that, but I don't

15  understand why--

16          HEARING OFFICER WOODS:  Because she asked

17  you for the rule, that's why, Ms. Rodi.

18          MS. RODI:  Okay, I mean, I just have--

19          HEARING OFFICER WOODS:  When counsel--no,

20  no, all you have to do is, I think--

21          MS. RODI:  I don't have it here.

22          HEARING OFFICER WOODS:  Okay, I'm going to

wtk

1  give you a minute to grab it.  That's all you have

2  to do.

3           [Break.]

4           HEARING OFFICER WOODS:  We're back on the

5  record.  So, you are--DCPS had an objection to the

6  five-day disclosure of Parent and what's your

7  pleasure with regard to that discussion.

8           MS. RODI:  I'm withdrawing it.

9           HEARING OFFICER WOODS:  This objection is

10  withdrawn.

11           MS. RODI:  And, so then there's no

12  objections.

13           HEARING OFFICER WOODS:  Okay, so the

14  disclosure is admitted as part of this record.  I

15  received from DCPS a disclosure letter dated

16  November 4, 2005, that lists 12 witnesses and

17  attached two exhibits.  Ms. Alvarez are you in

18  receipt of that disclosure?

19           MS. ALVAREZ:  Yes, I believe I did, let me

20  just double check.

21           HEARING OFFICER WOODS:  Okay.

22           MS. ALVAREZ:  Yes, two one-page exhibits,

wtk                                                                    11

1   is that correct?

2           HEARING OFFICER WOODS:  Yes.

3           MS. ALVAREZ:  Yes.

4           HEARING OFFICER WOODS:  Any objection to

5   their admission?

6           MS. ALVAREZ:  No.

7           HEARING OFFICER WOODS:  Then without

8   objection they're admitted.  Ms. Alvarez, it

9   sounded like there's a change in the hearing.  I

10  was under the impression we are here on a failure

11  to place and I hear you talk about comp-ed, which,

12  we are on both?

13          MS. ALVAREZ:  This is a case where

14  [unintell.]

15          HEARING OFFICER WOODS:  Let me get you in

16  front of that mic so we can make sure we're picking

17  it up, I'm sorry.

18          MS. ALVAREZ:  Chanette Alston has attended

19  the Grafton School, which is the residential

20  placement school in Rockville, Maryland, since, I

21  think it was March of--or April of 2002.  In

22  February of 2003 at an IEP meeting, the Grafton IEP

wtk

1  team decided that Chanette also needed a day

2  placement at a Montgomery County Public School.

3         The reason for that was, they believed

4  that she needed a higher level of academic

5  challenge than they could provide her in their

6  day-educational program. So, a joint IEP was

7  developed and agreed upon in February of 2003 by

8  her Grafton/DCPS IEP team. And it called for a

9  continued placement at Grafton along with

10 attendance at a Montgomery County Public School

11 special-education day placement. And her IEP has

12 remained, essentially, unchanged since February of

13 2003.

14        However, DCPS has, for long periods of

15 that time, failed to issue the funding notice to

16 Montgomery County School System that was required.

17 Ms. Alston brought a due-process hearing complaint

18 in August of 2003 that was heard by Hearing Officer

19 Sy DuBow, because DCPS had not issued a funding

20 letter from February of '03 forward.

21        Hearing Officer DuBow heard the case and

22 ordered DCPS issue a funding letter forthwith for

wtk                                                                                      13

1   the '03/'04 school year.  DCPS did not do so.  And,

2   in fact, it did not do so until January of 2005.

3   So that for all of school 2003/2004 and for half of

4   school year 2004/2005, Chanette was without her

5   day-time placement, her day-school placement.

6          The hearing officer's determination is

7   included in--was listed integrated he disclosure

8   package and I have extra copies of it.  The DCPS

9   did not issue a funding letter until January of

10  2005.  And that is documented in the Parent's

11  Exhibit 6, which is the Cabin John transmittal

12  package, which shows the letters from the residency

13  and tuition compliance officer Montgomery County

14  Public Schools stating the dates on which they had

15  received the funding authorization from DCPS.

16         And you will see that the first of those

17  is dated January 19, 2005.  The second of those is

18  dated September 27, 2005.

19         So, the Parent is requesting at this

20  point, compensatory-education services to

21  compensate her for the period during which DCPS

22  failed to issue the required tuition authorization;

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

wtk

1   that is, from September 2003 until January 19,

2   2005.

3          Now, at an IEP team meeting held on May

4   2005, her IEP team at Cabin John Middle School met

5   and discussed the issue of compensatory services.

6   The Cabin John meeting, that's the IEP meeting

7   notes included in the Parent's disclosure package

8   as Exhibit 7--I'm sorry, as Exhibit 5.

9          And at the May 2005 IEP meeting, the

10  persons--the IEP team members present at the time,

11  reviewed the issue of compensation for Chanette and

12  recommended that Chanette receive an hour of

13  tutoring daily in reading and writing, following

14  the Wilson reading instruction program.

15         And that she receive assistive technology

16  in the form of phonographic software that she could

17  use on her computer to assist her in reading and

18  writing.

19         The Parent, at this point, is requesting

20  an order requiring DCPS to fund Chanette with

21  one-hour a day of tutoring and the phonographics

22  hardware that she requires.

wtk

1    At that same IEP team meeting, her

2   day-teacher, Ms. Sala [ph], stated Chanette is

3   currently functioning in reading and writing at the

4   pre-primer level.  As the October 2001 achievement

5   scores that are included as Parent's Exhibit 7

6   show, Chanette was then, in October of 2001,

7   functioning on the K-level, the kindergarten level.

8   So, essentially, Chanette has either regressed or

9   not made progress, since 2001.  And as the IEP team

10  meeting notes show, Ms. Sala, her teacher, and the

11  IEP concluded that she should be, given her

12  cognitive abilities, somewhere working at somewhere

13  at the third-grade level.

14    So, the Parent is requesting that she

15  receive an hour of tutoring daily; and the

16  phonographics software, until she reaches the

17  third-grade reading and writing level.

18    I'll note, just for the Record, to place

19  this in context, the Parent's due-process complaint

20  originally asked for an order ordering DCPS to

21  issue the funding authorization for this year,

22  because as of September of 2005, DCPS had failed to

wtk

16

1  issue the funding authorization for this current

2  school year.

3        Ms. Alston filed suit in Federal District

4  Court and in the course of that suit, DCPS issued a

5  funding authorization for this school year.  So,

6  that no longer is an issue here.

7        What is at issue here is

8  compensatory-education services for the period

9  September '03-forward.  The Parent is requesting

10 September '03-forward, only because of the statute

11 of limitations.  Since, clearly, Chanette was

12 entitled to compensatory services, dating back to

13 February of '03, when the IEP team first met and

14 determined that she needed those day-time

15 placement--that day-time placement and CPS, but

16 because of the statute of limitations, the Parent

17 is requesting compensatory services only from

18 September of '03 through January of '05.

19        HEARING OFFICER WOODS:  Ms. Rodi, do you

20 have a response to the comp-ed request?

21        MS. RODI:  First of all, the software and

22 the tutoring were not in her hearing request.  So,

wtk

1    therefore, they cannot be brought up here today.

2            Second, in terms of any other issues, the

3    fact is that DCPS was not--if the Student was--they

4    wanted to place the Student at Grafton because the

5    Student needed more challenge, yet Ms. Alvarez is

6    also saying that the Student was behind.  So, we're

7    confused on that point.

8            And, then, the next point, we did not fund

9    this--we were not responsible for funding the

10   Student during this period.  It was, actually, CFSA

11   was responsible for that type of funding.  And, in

12   fact, what she put in her disclosures were actually

13   letters from the District of Columbia Department of

14   Health Services has agreed to pay tuition for the

15   Student to attend Montgomery County Public Schools

16   for this school year.  This is not DCPS, this is

17   [unintell.] health services.

18           HEARING OFFICER WOODS:  That's not at

19   issue at this point.  At issue is the comp-ed.

20           MS. RODI:  But the fact is that the

21   non-payment was not due to DCPS--

22           HEARING OFFICER WOODS:  I see.

wtk

1          MS. RODI:  It was due to the health

2     services.  So, any period of comp-ed was not due to

3     DCPS's lack of funding, it was the Department of

4     Health Services.

5          MS. ALVAREZ:  So, it's your argument that

6     DCPS has no responsibility for paying the tuition?

7          MS. RODI:  Right here, in these letters it

8     says to inform you that the District of Columbia

9     Department of Health Services, until the

10    most-recent, this school year, when we assumed the

11    authorization report, it came through the

12    Department of Human Services, as well.  We only

13    issued the prior notice.  We did not issue and

14    because it doesn't--what this is the prior notice

15    and this is the authorization for tuition and it

16    comes from the Department of Human Services.

17         MS. ALVAREZ:  Well, whatever it may come

18    from--the fact of the matter is that she is a DCPS

19    student and DCPS is responsible.  If DCPS chooses

20    to forward her and in some way make DHS

21    responsible, under federal law, under Section 1412

22    of the statute, DCPS, as an SEA is responsible for

wtk

1  all--ensuring the payment of all the

2  special-education needs of all students.

3          I don't understand what you think this

4  means. Because the fact of the matter is that it

5  was a DCPS IEP Team that placed her at Grafton; a

6  DCPS IEP team that determined, in February of '03,

7  that she required the day-placement, as well as the

8  Grafton placement; and it was a DCPS Hearing

9  Officer who ordered DCPS and not DHS, in the August

10 2003 Hearing Officer's determination to pay her

11 tuition at both.

12         MS. RODI:  And he may have ordered it, but

13 he can't--it's not--it [unintell.] auspices because

14 of the nature--we're paying for a residential

15 program.  So we pay for a full-time program

16 already.  And, so, I mean, you will see that we

17 actually didn't--well, right now she's at

18 [unintell.] school, not being authorized by us.

19 It's being authorized by the Department of Human

20 Services.  That's what the paperwork says. 9/19, I

21 mean, 9/22/05.

22         MS. ALVAREZ:  I would object to the DCPS

wtk
1  staff attorney's testimony, if that's what it is.

2          The fact of the matter is that none of the

3  paperwork shows, supports what the DCPS staff

4  attorney is stating.  If DCPS is erroneously--

5          MS. RODI:  Look at the paper.

6          MS. ALVAREZ:  --I've already looked at it.

7          MS. RODI:  It says Department of Health

8  Services, right on top.

9          MS. ALVAREZ:  DCPS has erroneously papered

10  the payment authorizations--

11          MS. RODI:  We didn't paper it, the

12  Department of Health--of Human Services papered it.

13          MS. ALVAREZ:  If D.C.--if I may finish, if

14  DCPS has erroneously papered the payment

15  authorizations, that's DCPS's responsibility.  DCPS

16  has failed to comply with the Hearing Officer's

17  Order, which is in the record and that's directed

18  to DCPS and not DHS.  And the Parent is requesting

19  a finding that DCPS violated the '03 Hearing

20  Officer's determination requesting a finding that

21  DCPS is liable for compensatory education services

22  from 9/2003 through January 2005, since that is the

wtk

1   period during which, DCPS failed to comply with the

2   Hearing Officer's determination and failed to issue

3   a payment authorization to MCPS.

4           HEARING OFFICER WOODS:  Is the--is

5   the--are you saying that the Order that required

6   DCPS to do that--

7           MS. ALVAREZ:  Mm-hmm.

8           HEARING OFFICER WOODS:  --they didn't have

9   to do it?  Is that your position?

10          MS. RODI:  No, I'm saying that--

11          HEARING OFFICER WOODS:  Because her

12  position is that Order was violated.

13          MS. RODI:  --the funding problem--I mean

14  the funding issue is with--is with District of

15  Columbia Department of Human Services.  As in her

16  own disclosures, she releases--she says, from

17  Montgomery County that says the District of

18  Columbia Department of Human Services.

19          Montgomery County was expecting money from

20  the Department of Human Services and not DCPS--

21          HEARING OFFICER WOODS:  Who is

22  responsible, though, for making it--is that how

wtk

1  payment is, but who is responsible for actually

2  providing him [sic] the education?

3       MS. RODI:  DCPS is providing the

4  education, but we didn't deny--our responsibility,

5  which was the actual placement, we did what, I

6  mean, she needs to take it up with Human Services,

7  not with DCPS.

8       HEARING OFFICER WOODS:  So, the part

9  that's seeking funding is the part where she was

10  attending a Montgomery County Public School, is

11  that right?

12       MS. RODI:  Right, because we were already

13  paying for the entire time--

14       HEARING OFFICER WOODS:  Okay.

15       MS. RODI:  --DCPS was paying for Grafton,

16  so--

17       HEARING OFFICER WOODS:  Now who--how did

18  the team agree to that?  Was DCPS a part of that

19  team that--

20       MS. ALVAREZ:  Yes, it was.

21       HEARING OFFICER WOODS:  And if you're a

22  part of that team that agreed to that, was there a

wtk

1   discussion, then, who would pay for it?

2        MS. RODI:  I don't believe there was a

3   discussion on who would pay for it.

4        HEARING OFFICER WOODS:  I see.  So, at

5   that point.

6        MS. ALVAREZ:  Ms. Rodi, you don't have any

7   basis for stating that, do you?  You weren't

8   present.  What documents do you have--

9        MS. RODI:  I have not seen any discussion

10  on the basis to pay for it.  You should know

11  whether there was a discussion on the basis to

12  paying for it.  It's not in there.

13       MS. ALVAREZ:  I would point the Hearing

14  Officer to the findings of the HOD.

15       MS. RODI:  I'm not talking about the HOD,

16  I'm talking about the--he asked specifically about

17  the meeting.

18       MS. ALVAREZ:  Yes.

19       [Simultaneous conversation.]

20       MS. ALVAREZ:  --made findings of fact and

21  conclusions of law as to what the Record that was

22  presented to him showed and he states they showed

wtk

1   that, if you look at--I'm sorry, do you have a copy

2   of that--

3           HEARING OFFICER WOODS:  I don't see

4   anything here, it may be in here, but I don't.

5           MS. ALVAREZ:  --I think, let me see if I

6   have an additional copy of that or not.

7           HEARING OFFICER WOODS:  If you read it,

8   yeah, first, do you have it?

9           MS. RODI:  No, because all of her

10  disclosure didn't come through.

11          HEARING OFFICER WOODS:  Okay.

12          MS. ALVAREZ:  Okay, let's see--

13          HEARING OFFICER WOODS:  Why don't you read

14  it and we can get a copy.

15          MS. ALVAREZ:  --let's see, it's on Page 3,

16  that on February 6, 2003, there was an MDT meeting

17  held at Grafton, all right, that determined that

18  and adopted an IEP meeting that agreed that

19  Chanette would attend the Montgomery County CSBP

20  program; that Mr. Sherry [ph] was present, that

21  appears on Page 4, he was the DCPS liaison and

22  approved DCPS funding at the meeting.  That is

wtk

1  finding of fact No. 4, appearing on Page 4 of the

2  August 2003 Hearing Officer's determination.

3         It further goes on to say, and I will

4  quote, quote, "Mr. Sherry approved DCPS funding at

5  the meeting.  Mr. Sherry was informed that an

6  authorization letter would be needed.  He complied

7  and indicated that he would"--file, I guess--"fax

8  this form to Grafton's case manager.  And after

9  subsequent phone calls to DCPS for the

10  authorization letter, Ms. Contessa Lee [ph]

11  informed the education director and case manager

12  the funding was not properly authorized for day

13  placement in Montgomery County.

14         "Mr. Martin Shay [ph] requested further

15  meetings with Grafton and Ms. Alston to discuss

16  placement."

17         It then goes on to find that DCPS

18  fabricated documents concerning IEP team decisions

19  and orders--

20         MS. RODI:  Where does it say--

21         MS. ALVAREZ:  --on the final page, Page 7,

22  DCPS shall continue to fund the student's placement